**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ROBERT ERICKSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 05 C 2718** |
| | ) | |
| **SCIL, LLC, d/b/a Saks Fifth Avenue,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Robert Erickson has sued his former employer, SCIL, LLC, which does business as Saks

Fifth Avenue. Saks hired Erickson in December 2001 and fired him in December 2002.

Erickson, who is Caucasian, alleges that Saks terminated him based on his race and in retaliation

for making a complaint about discrimination. Saks has moved for summary judgment. For the

reasons stated below, the Court grants Saks' motion.

**Facts**

Saks operates department stores, including one in downtown Chicago. It hired Erickson

in December 2001 to work as asset protection manager at the downtown Chicago store. In this

position, Erickson was required to supervise other asset protection personnel responsible for

(among other things) detecting and apprehending shoplifters, perform that same type of work

himself, and investigate employees and complaints. Erickson also had some responsibility in

hiring personnel, though the final decision rested with his supervisor. In October 2002, Saks

promoted Erickson to district asset protection manager.

Erickson contends that in early 2002, Bette McNamara, his supervisor at the time, told him to give Caucasians preferential treatment in hiring and not to hire African-Americans. She said it was harder to terminate African-Americans because they had to be given "progressive discipline," which, evidently, was not the case for Caucasian employees. Indeed, Erickson claims, there were occasions when he recommended particular African-American employees for termination or discipline, but McNamara overruled him because of the supposed need to go through progressive discipline.

According to Erickson, McNamara told him that if he kept hiring African-Americans, he and his department would suffer. Erickson says he told McNamara he thought what she was proposing was illegal. And despite what he claims McNamara said, Erickson kept proposing African-American candidates for hiring; McNamara supposedly kept repeating her earlier warnings. In August-September and in October-November 2002, Erickson says, he reported McNamara's warnings to Saks human resources managers.

In December 2002, Anthony Caccioppoli, Saks' senior director of asset protection, received an anonymous e-mail alleging that Erickson was responsible for an improper detention of a woman he had detained for shoplifting (we will refer to her as "Individual D").[1] Caccioppoli later got another anonymous e-mail saying that if he investigated Erickson, other incidents of wrongdoing would emerge. Caccioppoli, who works in New York, sent Corey Gonnella, his director of investigations, to Chicago to conduct an investigation regarding these allegations.

---

[1] There is some evidence suggesting that Erickson and others had suspected Individual D of shoplifting on prior occasions but had been unable to catch her in the act.

2

Gonnella obtained written statements from several asset protection employees and also interviewed them. McNamara was present at the interviews and is claimed to have asked questions of some or all of the employees. She prepared a report documenting her presence at the interviews.

At the conclusion of the investigation, Gonnella prepared a report for Caccioppoli summarizing his findings. Gonnella noted that Erickson's report regarding Individual D stated that he had observed her shoplift on the store's third floor, take an internal escalator to the seventh floor, exit the store, and re-enter via another door on the same floor. According to Gonnella, two other asset protection associates, Howard Denham and Gerjuan Bouldin, said that on the day of the incident, Erickson had radioed that Individual D exited the store on the third floor and that he later radioed that she was on the eighth floor. This was consistent with what the anonymous e-mailer had reported to Caccioppoli.

Gonnella also stated in his report that he had concluded that on two occasions, Erickson had asked George Sanders and Chris Sandoval, both members of Erickson's staff. to falsify reports concerning another shoplifting case and a series of audits of the store safe. Gonnella stated that when interviewed, Erickson had admitted that he had directed Sanders to backdate audit reports to mislead Saks auditors in case they arrived unannounced. Gonnella also stated that he believed Erickson had been deceptive in giving his version of the Individual D matter. *See* Def. Ex. 7. Gonnella attached to his report the statements of Denham, Bouldin, Sanders, and Sandoval.

Caccioppoli reviewed Gonnella's report. He discussed his conclusions with corporate human resources director Marcia Miller. Caccioppoli recommended terminating Erickson based

3

on Gonnella's findings.  Miller concurred in the recommendation.  Caccioppoli and Miller both testified that they, and they alone, participated in the termination decision.

## Discussion

The Court may grant Saks' motion for summary judgment only if there is no genuine issue of fact and Saks is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In deciding the motion, the Court is required to view the facts and any reasonable inferences in the light most favorable to Erickson, the non-moving party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

In its motion for summary judgment, Saks argues that Erickson cannot sustain his claims of discrimination and retaliation and that it had a legitimate, non-discriminatory and non-retaliatory reason to terminate Erickson – specifically, his handling of the Individual D matter and his falsification of reports.  Saks contends the decision to terminate Erickson was made by Caccioppoli and Miller, who did not treat Erickson differently from other similarly employees based on his race, and who were unaware of Erickson's complaint about his practice of hiring African-American workers.

In response, Erickson contends that he has evidence from which a jury reasonably could find discrimination and retaliation based on both the "direct" and "indirect" methods of proof. Erickson does not attribute any discriminatory or retaliatory intent to Caccioppoli or Miller. Rather, when each of Erickson's contentions are analyzed, it becomes clear that his chance of avoiding summary judgment depends on his ability to show that McNamara participated in the decision to terminate him.  But as the Court will discuss, Erickson lacks evidence from which a jury reasonably could find that McNamara participated in the termination in a way the law

4

considers meaningful.

**1.      Race discrimination claim**

The Court first discusses Erickson's race discrimination claim.  The direct method of proof allows a plaintiff to show discrimination by offering either evidence that allows a reasonable juror to conclude, without resorting to inference, that the employer terminated the plaintiff for an illegal reason, *see, e.g., Velez v. City of Chicago,* 442 F.3d 1043, 1049 (7th Cir. 2006), or a "convincing mosaic" of circumstantial evidence that allows an inference of discrimination, *see, e.g., Jordan v. City of Gary,* 396 F.3d 825, 832 (7th Cir. 2005).  This can consist of, for example, suspicious timing, ambiguous statements, or other acts toward employees of a particular race from which an inference of intent could be drawn, or evidence that similarly situated employees in another racial group received systematically better treatment. *See, e.g., Troupe v. May Dep't Stores,* 20 F.3d 734, 736 (7th Cir. 1994).

In a case in which a Caucasian plaintiff complains of race discrimination, the indirect method of proof requires the plaintiff to establish a *prima facie* case of discrimination by showing he was meeting his employer's legitimate expectations, was subjected to an adverse action, was treated less favorably than similarly situated workers of a different race, and that background circumstances allow an inference that the employer has an inclination to discriminate against Caucasians or that there is "something fishy" about the facts.  *See Scaife v. Cook County,* 446 F.3d 725, 729 (7th Cir. 2006); *Ballance v. City of Springfield, Ill. Police Dep't,* 424 F.3d 614, 617 (7th Cir. 2005).  If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its action, and if the employer does so, the burden shifts back to the employee to show that the employer's

5

stated reason is a pretext for discrimination. *See, e.g., Ballance,* 424 F.3d at 617.

By way of "direct" evidence, Erickson says that unlike similarly-situated African-American workers, he was not given "progressive discipline," i.e., notice of his alleged misconduct and a chance to improve. But although Erickson has provided an employee handbook issued by Saks, it contains no "progressive discipline" policy. (Indeed, Erickson does not claim that progressive discipline applied to everyone, even nominally; he says it existed only for African-American workers.) Erickson's sole evidence of the existence of this practice arises from McNamara's comments to him and the way McNamara dealt with his requests to terminate certain African-American workers. In short, he has no evidence that anyone other than McNamara – specifically, Caccioppoli and/or Miller – gave this type of favorable treatment to African-American workers.[2] As a result, Erickson's contention that these incidents are direct evidence of racially disparate treatment depends on whether McNamara participated in the decision not to give Erickson "progressive discipline" before terminating him.

Erickson cites this same evidence to support his argument that he can establish race discrimination via indirect evidence. Specifically, he contends that he was treated differently from similarly situated African-American workers. They were similarly situated, Erickson says, because "both Plaintiff and the subordinates dealt with the same supervisor: McNamara," Pl. Mem. at 6, who Erickson claims was directly involved both in deciding whether to terminate the

---

[2] Erickson also contends that Saks human resources director Ed Slusser confirmed that Saks' policies required progressive discipline for African-Americans but not for Caucasians. Pl. Mem. at 2. The evidence Erickson cites, however, does not actually support his contention. Rather, it consists of Erickson's testimony that *he* talked to *Slusser* about "problems with disciplining African-Americans," not that Slusser confirmed there was a practice or policy in this regard. *See* Erickson Dep. 60-61.

African-American workers and in deciding to terminate Erickson. Thus Erickson's ability to make out a *prima facie* case turns on whether McNamara participated in the termination. (Though Erickson also contends the reasons given for his termination are pretextual, the Court need not address that issue if Erickson cannot make out a *prima facie* case of discrimination.)

**2.      Retaliation claim**

A plaintiff can sustain a claim of retaliation by direct evidence, namely, that he engaged in protected activity and suffered an adverse action as a result. *See, e.g., Stone v. City of Indianapolis Pub. Util. Div.,* 281 F.3d 640, 644 (7th Cir. 2002); *Culver v. Gorman & Co.,* 416 F.3d 540, 545-46 (7th Cir. 2005). Erickson contends that he can establish his retaliation claim via this method. He relies on evidence of McNamara's allegedly repeated threats that his job would be in jeopardy if he kept hiring African-Americans, combined with her alleged involvement in the decision to terminate him.

Indirect evidence sufficient to support a retaliation claim consists of evidence that the plaintiff was performing his job adequately yet suffered an adverse action and that others similarly situated who did not engage in protected activity were treated better. If the plaintiff presents such evidence, the employer is required to articulate a legitimate, non-retaliatory reason for the termination, and if the employer does so, the plaintiff bears the burden of showing the employer's stated reason is a pretext for retaliation. *See, e.g., Moser v. Indiana Dep't of Corrections,* 406 F.3d 895, 903 (7th Cir. 2005).

To establish a *prima facie* case via the indirect method of proof, Erickson contends that he was treated differently from McNamara, who he says had also falsified a report but had not complained about discrimination, and was not terminated. The Court need not give the indirect

evidence claim extended treatment. Erickson does not contend that Caccioppoli or Miller supervised McNamara or had any knowledge of any claim of misconduct on her part. Instead, Erickson says that McNamara's supposed report falsification was overlooked by her supervisor, Rosemary Sostillo. The problem is that there is no evidence at all that Sostillo had anything to do with the decision to terminate Erickson; indeed, the contentions in Erickson's statement of facts that he cites to support his claim that Sostillo was involved have nothing at all to do with his termination. *See* Pl. Mem. at 15 (citing Pl. Stmt. of Add'l Facts ¶¶ 5, 10-12).

**3.     McNamara's role in the termination**

As discussed above, Erickson's claim of race discrimination and his claim of retaliation depend on his ability to prove that McNamara had a legally meaningful role in the decision to terminate Erickson.

The undisputed facts reflect that the ultimate decision to terminate Erickson was made by Caccioppoli and Miller, not McNamara. Erickson contends, however, that McNamara played a role in the termination sufficient to allow her allegedly discriminatory and retaliatory motivation to be imputed to the decision makers. The Seventh Circuit has held that a non-decision maker's motivation may be imputed in this way if the decision maker rubber-stamps the recommendation of someone else who has a discriminatory or retaliatory motive, or if the non-decision maker influences the decision by concealing relevant information from, or feeding false information to, the decision maker. *See David v. Caterpillar, Inc.,* 324 F.3d 851, 861 (7th Cir. 2003). "'In such a case, the [discriminatory or retaliatory] motive of the other employee, not the autonomous judgment of the nondiscriminating decision-maker, is the real cause of the adverse employment action." *Id.* (quoting *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1400 (7th Cir. 1997)).

8

Though Erickson contends that McNamara recommended his termination, he has not submitted evidence from which a jury reasonably could find that Caccioppoli simply ratified her decision. There is no question that Caccioppoli made his own decision, and there no evidence that he considered or was even aware of any recommendation by McNamara. McNamara was present at the interviews of asset protection staff conducted by Gonnella and may well have asked questions. But Gonnella was the Saks employee charged to investigate Erickson, and Gonnella prepared the report that Caccioppoli relied on in terminating Erickson without giving him "progressive discipline." Erickson points out that McNamara prepared a report of her own, but her report was only a single page long and stated only that she had been present with Gonnella at the interviews, that Erickson was interviewed and denied wrongdoing, and that Erickson was suspended. See Def. Ex. 6. Erickson has offered no evidence that Caccioppoli relied on anything McNamara said in that report in making his decision.

Erickson's primary contention is that McNamara influenced the decision by concealing important information from Caccioppoli. Specifically, he argues that McNamara concealed the fact that certain witness statements were conflicting and thus not reliable; that store surveillance cameras commonly malfunctioned and thus it was not suspicious that, during the Individual D incident, the cameras were not working; that Erickson was not responsible for Sanders' backdating of audit reports, as McNamara herself had, allegedly, directed Erickson to do this; and that as a new manager, Erickson's style was to follow company procedures carefully.

None of this, even if considered as a whole, is sufficient to permit a reasonable jury to find that McNamara concealed relevant and material information from Caccioppoli in a way that reasonably could be found to have influenced his decision. First, the purported contradictions in

9

the witness interviews were reflected in the interview memos and thus were readily available to Caccioppoli, irrespective of anything McNamara did or did not do. Second, Erickson has not actually offered any evidence that McNamara had knowledge of any problem that would cause all of the security cameras to stop working at the same time, as evidently occurred during the Individual D incident. Third, though McNamara did not advise Caccioppoli that she had told Erickson to have Sanders backdate reports (as Erickson claims), Erickson says that he himself advised Gonnella of this information, and thus he cannot claim it was concealed. And fourth, even if McNamara did not advise Caccioppoli or Gonnella that Erickson's style was to carefully follow procedures, Erickson has not explained how this information possibly could have been material to the decision whether to sanction Erickson.

In short, no reasonable jury could find that McNamara had any impact on the decision to terminate Erickson. Thus her allegedly discriminatory and retaliatory motivation cannot be attributed to the ultimate decision makers. For this reason and those cited earlier, Erickson cannot sustain his claim of race discrimination under the direct method of proof and cannot make out a *prima facie* case of discrimination under the indirect method, and he likewise cannot sustain his retaliation claim under either method.

### Conclusion

For the reasons stated above, the Court grants defendant's motion for summary judgment [docket no. 23]. The Clerk is directed to enter judgment in favor of the defendant. The trial date of January 8, 2007 is vacated.

Date: September 5, 2006

_____
MATTHEW F. KENNELLY
United States District Judge

10